IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2024

## STATE OF TENNESSEE v. THOR LUCAS COLEMAN

**Appeal from the Circuit Court for Williamson County**
**No. W-CR210431      Joseph Woodruff, Judge**

_____

**No. M2023-00139-CCA-R3-CD**

_____

A Williamson County jury convicted the Defendant, Thor Lucas Coleman, of attempted first degree murder, aggravated assault by strangulation, aggravated assault by violating a restraining order, possessing a firearm during the commission of a dangerous felony, and unlawful possession of a weapon. The trial court sentenced him to a forty-five-year effective sentence. On appeal, the Defendant contends that: (1) the trial court improperly admitted evidence of his prior acts of domestic violence against the victim; and (2) the evidence is insufficient to sustain his conviction for attempted first degree murder. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Matthew J. Crigger, for the appellant, Thor Lucas Coleman.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Stacey Edmonson, District Attorney General; and Jennifer K. Dungan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant assaulting his girlfriend on May 7, 2021. For the events surrounding the assault, the Williamson County grand jury indicted the Defendant for attempted first degree murder, aggravated assault by strangulation, aggravated assault by violating a restraining order, possessing a firearm during the commission of a dangerous felony, and unlawful possession of a weapon.

## A. Pretrial Facts

Pretrial, the State filed a notice of intent to use Tennessee Rule of Evidence 404(b) evidence against the Defendant. It sought to introduce evidence of the Defendant's history of domestic violence with the victim and his history of drug use and delivery with the victim to provide a contextual background. The State cited six incidents of specific conduct: (1) the Defendant hit the victim in the face on June 1, 2019; (2) the victim began using Xanax with the Defendant and continued to use Xanax, marijuana, and alcohol with the Defendant for the duration of their relationship; (3) in November 2019 the Defendant kicked the victim's windshield and shattered it. He then kicked the victim in the head, she called 911, he fled, was arrested and charged with assault. He was placed on bond with conditions; (4) Around January 2020, the Defendant strangled and beat the victim in a hotel. The victim was pregnant. She ran to the front desk, he fled, was arrested, and served one year in jail; (5) on New Year's Eve 2020, the Defendant took the victim's car while she was sleeping and got into multiple car accidents. Police arrived and the Defendant resisted arrest, causing them to enter the home with flash-bang grenades; (6) On May 7, 2021, before the incident, the Defendant went to the victim's friend's home and stole three of the victim's friend's phones. This contributed to the argument that led to the crimes in this case.

During a hearing on the motion, the victim testified that she met the Defendant in February of 2019 through an online dating app. At the time, the victim was "closing" her divorce and, in May 2019, her twin sister died. She began using Xanax, and the Defendant introduced her to multiple Xanax dealers. The Defendant encouraged her to use Xanax and alcohol, and the victim opined it was in part because he had access to her vehicle, home, and money when she was under the influence of drugs and alcohol.

The victim described this assault saying that at the time she rented a house in downtown Franklin. She was working from home on May 7, 2021, while the Defendant was present at home with her. The Defendant was frustrated that she was having to work, so he played loud music from the living room and complained. He asked to use her car, and she said no because he did not have a valid driver's license. After her work concluded, she drove the Defendant to his friend Brandon's house in Smyrna, Tennessee, and then to her friend Tammy's house. The victim had previously rented a room from Tammy, and she felt that Tammy may not have returned some money that she owed her. Tammy was not returning the victim's calls, and she lived near Brandon, so the victim and the Defendant stopped by Tammy's house.

Tammy was home and invited the victim inside. Shortly thereafter, the Defendant approached the back door "irate" about the duration of time the victim had been inside. While the victim did not know this at the time, Tammy had three cellphones on the table by the door. After the Defendant came in the door, Tammy noticed the phones were missing and asked the victim and the Defendant about the phones. The Defendant and

2

Tammy began arguing about the phones, and the victim did not know who to believe. After the Defendant and the victim left, they continued to argue about the phones, and the Defendant continued to deny that he took them. The victim took Xanax and poured a glass of wine. About an hour-and-a-half later, the victim found the phones in her house in a black backpack in her spare bedroom. Also in the backpack, she found a gun, money, and marijuana. The victim sent pictures of the phones to Tammy, who identified them as the ones she was missing. Tammy came later to retrieve the phones.

The victim said that finding the gun scared her "tremendously." The Defendant was not supposed to have a gun because he was a convicted felon and, knowing what he had done to her in the past with just his hands, she was scared for her safety. She immediately voiced her concern to him, and he immediately became defensive. The victim told the Defendant that she was going to call the police, and he said "you can't do that . . . . My son will grow up without a father, and you can't do this" and attacked her. He pushed her to the floor and began hitting her head on both sides and also her face. He also hit her torso around her stomach and abdomen while straddling her. He then placed both of his hands around her neck and said, "Is this what you want, is this what you wanted, is this how you want to die[?]"

The victim focused on trying to breathe and not lose consciousness, and she heard a pounding at the door. It was the police, who arrived to find the Defendant strangling her. The police intervened and separated the two, and they then photographed the victim's injuries. She was bleeding from her ear, caused by a hematoma on her brain, a black eye, and facial bruising. She also had bruising to her stomach, abdomen, and right thigh. The victim had a partial tooth, which the Defendant knocked out of her mouth onto the kitchen floor. The photographs of the victim's injuries additionally included a hole in her lip and significant lip swelling.

The victim then described the five previous incidents mentioned in the motion by the State. She said that the first time that the Defendant hit her was June 1, 2019, after the victim caught him going through her purse looking for Xanax. The Defendant hit her face with his fist, so she ran and called 911. Law enforcement officers arrived and arrested the Defendant. In November 2019, the victim brought the Defendant to a "friendsgiving" get-together at the victim's friend's house. He did not get along with her friends, so the two left. The victim was upset with the Defendant, and the two argued as the victim was driving them home. She pulled over and asked him to get out of the vehicle. He used steel-toed boots he was wearing to kick out her windshield and then kicked her in the head. She screamed for attention and, as people approached the vehicle, the Defendant exited her vehicle. The victim then drove away and called 911. Police officers arrived and later arrested the Defendant. There was a "no contact" order put into place requiring that the Defendant not be around the victim.

The State introduced the warrant from Davidson County for the Defendant's arrest. It also offered the bond conditions, which included that the Defendant not have any contact with the victim.

In February 2020, the victim recounted that she was living with her mother, who had "banned" the Defendant from coming to her home. Since the Defendant was homeless, the victim and the Defendant decided to get a hotel room in Columbia, Tennessee. The two began to argue. The Defendant held her down, hit her in the stomach, and strangled her. This was the first time he had strangled her, and she could not breathe. When he loosened his grip, she ran away and went to the motel lobby and asked the clerk to call 911. Law enforcement officers arrived, and the Defendant initially evaded arrest, but he was eventually arrested. Officers photographed the victim's injuries, and she identified those photographs, which depicted marks on her neck.

In December of 2020, the night of New Year's Eve, the Defendant and the victim were at her home in downtown Franklin. The two drank and smoked marijuana, and she also consumed Xanax. The victim fell asleep and awoke to the police knocking on her door asking her if she owned a 2019 Toyota Rav 4. She said she did and that it was in her driveway. Unbeknownst to her, the Defendant had taken her vehicle and gotten into multiple car accidents in it. The victim said that police officers were at her home for three hours and, when they left, she consumed alcohol and Xanax and went back to bed. She awoke this time to the Defendant standing at the end of her bed. The two argued about him taking her vehicle, and she told him to leave because he was not allowed to be at her home. He refused to leave and took her cellphone. He detained her at her home for eight hours. During her detainment, the SWAT team and members of her family came to her home. The SWAT team used lights and a microphone to communicate with the Defendant who refused to leave the house. The Defendant nailed blankets over the windows and, when the victim asked to leave, he refused her request. Eventually, the SWAT team forcibly entered the home and released the victim. The State introduced the warrants stemming from this incident.

The State introduced phone records from a video call placed by the Defendant to the victim while he was in jail. The first occurred on May 10, 2021, a few days after the Defendant's arrest for the May 7, 2021 attack. In the video call, the victim tells the Defendant that she is looking for Xanax, and the Defendant told her where it was in her home. At the time of the call, the victim was addicted to Xanax, and it had been almost 48 hours since she had consumed Xanax. She was certain she was going to end up hospitalized, so she panicked. Throughout their relationship, the Defendant would hide Xanax from her and use it to control her behavior.

During the video call, she and the Defendant discussed the abuse, and the victim told the Defendant that the abuse kept getting worse. The Defendant admitted that he violated his bond and then said that he was not in possession of a gun. He asked the victim

4

to tell the truth that she bought the gun because she wanted protection. The Defendant discussed the multiple charges he faced in multiple counties for his attacks on the victim. The Defendant asked the victim to lie about what happened in November 2019, so that at least that offense will be taken care of and not on his record. The victim asked the Defendant to look at her, showing him her black eye and large bruises on her side. He said, "You kept falling." The victim testified that she recanted her story in the past, and she agreed during the video call to testify as the Defendant wished. The victim said that this was the cycle of their relationship: the Defendant would hit her, end up in jail, call her and ask her to recant her story, she would, and he would be released.

During cross-examination, the victim testified that the Defendant purchased Xanax for her but then hid them from her and used them to control her. The victim agreed that it was her idea to go to Tammy's house when she realized that they were close by, and that money was one of the reasons that she went. She said that, when they returned from Tammy's house, she consumed multiple kinds of alcohol and Xanax. When the Defendant left to purchase some food, she looked around her home and found the backpack that contained drugs, money, and the cellphone. When he returned, she confronted him about the items she found, and the attack ensued. The Defendant initially wrapped his arm around her neck and dragged her into the kitchen.

After the Defendant beat her while straddling her, he strangled her. As she was losing consciousness, she heard a banging on the door. The Defendant got off her and threw the backpack into the dryer. The victim answered the door, finding that it was law enforcement officers. They entered the home and found the Defendant hiding in her closet.

The victim said that the charges against the Defendant for the June 1, 2019 incident were dropped after she recanted her testimony. About the November 2019 incident, she said she left as soon as the Defendant got out of her car, so she was not present when the Defendant got arrested. The Defendant was also charged with assaulting two police officers who arrested him that evening. About the February 2020 assault, in the hotel room, the victim said that the charges against the Defendant were dropped because she did not show up to the court date. She said that the Defendant knew that she was pregnant with his child at the time. About the New Year's Eve assault, she said that the Defendant did not have a valid driver's license at the time, and she did not give him permission to take her vehicle.

The victim agreed that, during the jail house video call, the Defendant told her that they both needed to go to rehab.

After the hearing, the trial court granted the State's motion but said it would give the jury the following limiting instruction:

5

If from the proof you find that the [D]efendant assaulted or committed another crime against Ms. Maria Hansen prior to May 8, 2021, you may not consider such evidence to prove his disposition or propensity to commit such a crime as that on trial. The evidence may only be considered by you for the limited purpose of understanding the contextual background and nature of the [D]efendant's and Ms. Hansen's relationship; the [D]efendant's state of mind before, on, and after the commission of the offense for which he is presently on trial; and the [D]efendant's intent to commit the offenses for which he is presently on trial.

Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than those specifically stated in this instruction.

## B. Trial

The case proceeded to trial at the beginning of which the State offered two stipulations of evidence. The first stipulation was a copy of the Defendant's previous felony conviction. It stated that on December 20, 2020, the Defendant was convicted of an attempt to commit a felony crime of violence. The second stipulation was a copy of the 911 call made by the victim's neighbor on May 8, 2021, at 1:52 a.m. The caller indicated that there were two people, one male and one female, yelling at each other outside the victim's home. He said that they had been outside and inside alternatively for more than an hour yelling at each other.

John T. Markovich testified that he was living on Harpeth Drive in Franklin, Tennessee, in May 2021. He had several jobs and responsibilities that kept him away from his home from 5:15 a.m. to 9:30 or 10:00 p.m. He said that, just after midnight on May 8, 2021, he was awoken by a car coming into the driveway next door. A man and woman slammed the doors of the vehicle and sounded to him as if they were intoxicated and arguing. The argument seemed to settle down after the couple slammed the door a few more times and Mr. Markovich went back to sleep.

The second time he awoke, he heard a female loudly scream while walking away from the house, but the argument quickly quieted down. Shortly thereafter, he heard a female voice that he described as "pitiful" begging by saying "no." Mr. Markovich described it as an "ugly, no leave me, stop, type of no." He said it sounded like the female was pleading for mercy with a muffled and hoarse voice of someone crying. He then called 911.

During cross-examination, he said that he had met the victim on one previous occasion when she asked to borrow a jack from him. He estimated that their houses were ten yards apart, and her driveway was only ten feet from his bedroom window.

6

Multiple police officers who responded to the 911 call about the disturbance in this case testified consistently. Officer Mike Oliver, Deputy Nicholas Smith[1], Officer Trevin Tolbert, all Franklin Police Department officers at the time, responded to the 911 call about this disturbance on May 8, 2021. Deputy Smith and Officer Tolbert had been to the same address on New Year's Eve, a few months before as SWAT team officers to execute a search warrant for the Defendant, so they preceded with heightened care from that previous experience with the Defendant.

Officer Oliver approached the house while Deputy Smith checked the perimeter of the house. The officers heard what sounded like male and female voices inside and what sounded like a female crying. The officers knocked on the front door for several minutes. Eventually, the victim opened the front door, and the officers entered the residence. The victim was "crying hysterically," "visibly distraught," and appeared to be in distress. She was bleeding from her mouth and had blood on her shirt and said she was in pain. Officer Tolbert opined that the victim had been in a physical altercation and had several injuries from that altercation.

The officers asked the victim where the Defendant was located, and she indicated that she did not know and then pointed them to the bedroom. When Deputy Smith had apprehended the Defendant on New Year's Eve, he was hiding in a bedroom closet, and he was in the same place on this occasion, lying on the floor in the closet under some clothing. Deputy Smith could hear the victim yelling from the other room that the Defendant had a gun. Because of this and because of the Defendant's history of violence, Deputy Smith drew his weapon and commanded the Defendant to exit the closet.

The officers placed the Defendant in handcuffs and then obtained two cellphones, a wallet, lighter and pocketknife from his pockets. The Defendant told the officers that one of the phones belonged to the victim. He also told them that this argument with the victim began over someone named Tammy who owed the victim money. Deputy Smith and Officer Oliver took the Defendant outside to one of their patrol vehicles, while Officer Tolbert remained inside speaking with the victim. The Defendant said that the argument was only a verbal confrontation. He denied possessing a firearm. The State entered Deputy Smith's body camera footage from his interaction with the Defendant. The video is consistent the officers' testimony. It additionally showed the Defendant denying that there was a gun in the home. He said neither he nor the victim owned a weapon and that there was not one in the home.

The victim told Officer Tolbert that she and the Defendant had gotten into an argument and that it had escalated to him punching her and throwing her to the ground. He

[1]Deputy Smith testified that he was currently a deputy with the Rutherford County Sheriff's Office but had been a Franklin Police Department officer at the time of this incident.

placed her in a choke hold, and she became unconscious. The victim had a laceration on her lip that was bleeding, swelling, bruising, and redness to her face and some redness on her neck. She was also missing one of her front teeth, which she told the officer was from a prior incident, and also missing some of her fake fingernails, which she said the Defendant had forcibly removed. The victim suffered bruising to her right ribs and her right hip. The victim's voice was "raspy", and she appeared to be having trouble breathing, as if she had recently been choked.

The victim told Officer Tolbert that the gun was in the dryer, which was in the kitchen. The officer looked in the dryer, and he found a Smith & Wesson M&P 9-millimeter handgun. The officer ensured that the gun was visible to his body camera, he donned gloves, and he retrieved the gun and gave it to another officer who had arrived, Officer Dressen, to safely store as evidence. Officers took the victim's written statement and photographed the victim's injuries. The State offered and the trial court admitted for the jury's review the photographs of the victim's injuries.

During cross-examination, officers agreed that the victim appeared to have been drinking. They further agreed that the Defendant appeared calm at the time of his arrest. He did not try to fight the officers and complied with their requests. The Defendant did, however, also appear to be under the influence of an intoxicant. Officers agreed that the gun they found was unloaded and that they did not find any ammunition in the home. Further investigation revealed that the gun had not been reported as stolen.

The victim testified and said that she met the Defendant in February 2019 on a social media site for dating. At the time, the victim was in the middle of a divorce and selling the only home she had ever purchased. Her relationship with the Defendant was wonderful, and they were happy. June 1, 2019, she moved with him to Columbia, Tennessee into an apartment that was owned by the Defendant's friend. On the day of their move, the Defendant assaulted her. He hit her in the eye with his hand. She called the police, and he was arrested. He told her that he was sorry, and she believed him, so their relationship progressed.

On June 19, 2021, the victim's twin sister unexpectedly died. The Defendant introduced the victim to people who illegally sold Xanax, which she began using and to which she became addicted. She regularly used Xanax throughout the duration of their relationship, including during the May 8, 2021 assault, and did not successfully overcome her habit until she went to rehab. At the time of trial, she had not used drugs since September of 2021.

The victim described the cycle of her relationship with the Defendant, including several more incidents of violence. She said that, around Thanksgiving 2019, six months after their first incident, she and the Defendant went to a catered Thanksgiving party at the home of her friend. The Defendant drank heavily while there and was not getting along

8

with the other attendees. To prevent embarrassment, she told the Defendant it was time to leave. He was unhappy about her decision, and the two argued while she drove them home. The argument got progressively worse, so the victim pulled into the nearest gas station and told him to get out of her vehicle. The Defendant was wearing metal-tipped boots, which he used in his construction job, and he leaned back in his seat and kicked out her windshield. He then turned to her and kicked her in the head with his right foot. The victim said she started screaming and people congregated at her car. He appeared scared and got out of her vehicle, after which she drove away. She called 911. Officers found the Defendant and arrested him, and an order was put into place ordering the Defendant not to have contact with the victim. The State submitted a stipulation of the parties agreeing that the order was admissible and then also the order itself, which was still in place at the time of trial. The order prohibited the Defendant from contacting, coming around, threatening, or assaulting the victim.

The victim said that, after the November 2019 incident she did not immediately begin dating the Defendant again. After a period of time, however, he contacted her, and she fell into a relationship with him again. Her mother, family, and friends did not approve of her relationship with the Defendant, and, in February 2020, she was living with her mother. Because of this, she met the Defendant at a hotel in February 2020 and another assault occurred. She "tossed" the Defendant's cellphone to him, and it landed on the bed next to him. He became enraged and got on top of her, held her down, and started hitting her. He then began to choke her by placing his two hands around her neck. The victim said she was in disbelief about what was happening and just tried to breathe. She reminded herself that it was going to stop, and, when the Defendant loosened his grip for a moment, she pushed him off and ran out of the door. She went straight to the lobby, screaming, asking them to lock the doors behind her and to call 911. The Defendant stole her vehicle and avoided apprehension for a day or two. Law enforcement eventually found him and arrested him.

For a period of time, the Defendant was incarcerated which limited the communication between the Defendant and the victim. When he called her, she talked to him. The victim explained that her mother had asked her to move out, so she was homeless. She was pregnant with the Defendant's child, whom she ended up miscarrying, and she was scared. Her friend Tammy had offered her a room, so she paid $800 in advance for two months' rent, using her recent income tax return. Within a week of giving this money to Tammy, she found a rental property in downtown Franklin. Tammy indicated that she would return the money to the victim.

On December 31, 2020, New Year's Eve, she was living in that rental house in Franklin. She was with the Defendant and working from home due to COVID protocols. The Defendant was with her for the entire day, and during that time the victim consumed alcohol and Xanax. That night, she fell asleep and, when she woke up, no one was home with her. She heard a banging on the door, so she answered the door. Two or three police

9

officers were present, and the victim noticed that her car was gone. The officers were looking for the Defendant, so she tried texting him and calling him, but he did not answer. The officers eventually left, leaving their contact information and instructions for her to call them if she heard from the Defendant.

The victim said she consumed another Xanax and went back to sleep. She did not wake up until around 8:00 a.m. the following day and found the Defendant sitting on her bed. She "flipped" out and asked him where he had been and told him that she needed to call 911. The Defendant had already taken possession of her phone and told her that she could not walk around the house but had to crawl. He took her blankets and tacked them over the windows in the house and told her to be quiet. He refused to allow her to leave, and the victim said she was scared.

The SWAT team arrived at her house seven hours later, which felt like "forever" to her. The Defendant told the victim she was not allowed to scream or communicate with them, and he told her that the SWAT team would go away. Fearing the Defendant, the victim obeyed his commands. The SWAT team shone a large light into the home and asked the victim and the Defendant to exit the house with their hands up. Officers eventually threw inside a flash bomb, which made a loud noise and created smoke. At that point, the victim ran out the front door. Law enforcement officers arrested the Defendant.

The victim said that she stayed with the Defendant after this incident because she loved him and because he said he would never do it again. He would tell her that her dead twin sister wanted them to be together and this compelled her, as if they were meant to be together. She said that, while this sounded unreasonable, it felt reasonable to her at the time.

Turning to the incident that led to the charges in this case, the victim said that on May 7, 2021, she was working from home, and the Defendant was at her house. The person whom the Defendant lived with was out of town, and so the Defendant stayed with her for several days. She understood at the time that the Defendant was not supposed to be with her because of the "no contact" order that was in place.

That day, while she was working, the Defendant was irritated and frustrated with her because she would not let him take his vehicle, so he played loud music from the living room. When she finished work at 4:00 p.m., the two decided to visit the Defendant's friend in Smyrna Tennessee. When they went outside, the victim noticed that her vehicle had been in an accident, and she confronted the Defendant. He told her that she must have driven while intoxicated and not remembered wrecking her vehicle, which she knew to be untrue. The couple went to Smyrna, visited the Defendant's friend, and then the victim realized that the Defendant's friend lived near Tammy, so she decided to go to Tammy's house and check on her because Tammy had not responded to her messages or phone calls, some of which were about the $800 Tammy said she would return to the victim.

10

At Tammy's house, the victim went inside by herself. The two discussed the money that Tammy owed her and visited. As the victim was about to leave, the Defendant entered the condo from the back door and appeared agitated, aggressive and angry. The victim and Tammy tried to calm the Defendant down and tell him that they had entered an agreement about the money so there was no reason to be upset. Right before the Defendant agreed to leave, Tammy noticed that three cellphones that had been on a table by her backdoor were missing. One phone was her work phone, one was her personal phone, and the third belonged to her recently deceased boyfriend.

Upon noticing them missing, Tammy accused the Defendant of taking the phones. He denied taking the phones, and the victim and the Defendant left Tammy's house and went back to the victim's house. They argued for the duration of the way home because the victim suspected that the Defendant was responsible for taking the phones. The two continued to argue in the car, and in the driveway, and then in her home. They arrived home from Tammy's house at around 8:00 p.m. on May 7, 2021.

The Defendant left the house, saying he was going down the street to purchase marijuana, and he was gone for approximately an hour and a half. During this time, the victim consumed alcohol and likely took a Xanax. She began searching for the phones while the Defendant was gone and found them in the spare bedroom where the Defendant kept his things. The Defendant returned to the house with a black backpack and saw where the victim had placed the three phones on her coffee table. She said to him, "well look what I found." The victim acknowledged that this testimony differed slightly from her testimony during the motion hearing, but she explained that she had been interviewed by the Defendant's attorney, and his questioning had reminded her about the order of events.

The Defendant admitted that he had taken the phones but said that it was not a big deal because Tammy owed her $800. The victim told the Defendant that she had texted a picture of the phones to Tammy, who confirmed that they belonged to her, and that Tammy intended to retrieve the phones. The Defendant acted as if this was no big deal, and their argument began to dwindle.

The Defendant unzipped the backpack with the intent to smoke the marijuana that it contained, and the victim saw the gun inside the backpack. She said she immediately "freaked out," jumped up, and asked him why he had a gun in her house. She said that she was scared because of his previous abuse that almost killed her on multiple occasions. She was timid about guns, never having owned one, and felt the only reason the Defendant would have a gun would be to kill her. Further, as the Defendant was a convicted felon, he was not supposed to have a gun.

The victim said that an argument ensued, and she asked the Defendant to leave. He would not comply and acted as if his possession of a gun was not a big deal. The victim

11

told the Defendant that she would call 911 if he did not leave immediately. The Defendant said: "Are you really going to F'ing do that? You are going to take my son away from me? You are going to put me away for life, and he is never going to have a father! You would do that to me?"

The victim said that, at this point, the Defendant came at her "full force." He put his arm around her neck and pushed her onto the floor. While she was on her back, he straddled her, beating her with both of his hands. She had just had dental surgery, and he hit her so hard that he knocked out her partial tooth. There was blood coming from her mouth and both of her ears. She suffered bruising to her eyes and all over her torso. The victim recalled that the Defendant looked like the "devil" and that, in his eyes, appeared "pure . . . empty, anger." The Defendant was saying things like "[t]his is what you get," and "this is what you want," and "this is how you are going to die."

The Defendant then placed both hands around both sides of her neck and strangled her. She felt helpless and believed she was going to die. She started to lose consciousness. She repeatedly told herself to not pass out and prayed. In this moment, she heard a banging at the door and could tell it was multiple people at the door. The voices asked them to "open up" the door.

The Defendant jumped up and grabbed the gun and the cellphones and put them in the black backpack and placed them into the dryer, located in the kitchen. The victim went to the front door and found the police officers. She said she told the officers that there was a gun in the dryer.

The victim discussed her injuries saying that she had "whelps" around her neck, multiple bruises on her torso, and bleeding from her right ear. Her eyes were blackened and swollen, as was much of her face and hands. Her false fingernails were gone, and her mouth was bleeding from where her temporary tooth had been knocked out. The victim identified pictures of her injuries that were taken by law enforcement. The victim said that she did not go to the hospital after being checked by emergency responders because she was concerned with her finances and did not have health insurance. Upon being convinced by her family, she sought medical treatment later in the day on May 8, 2021.

On May 10, 2021, the Defendant sent the victim a text from jail with a link for a video call with her. She agreed, partly because the Defendant had hidden the Xanax from her, and she wanted it. The victim had not yet met with the detective in this case.

The parties agreed to the authenticity of the jail house calls, and the trial court admitted a video of both calls into evidence. In the first video, the victim is crying and hyperventilating because she is suffering from withdrawal symptoms. The Defendant told her where he had hidden the Xanax, and she consumed a Xanax during the call. In the call, the Defendant told the victim to put on makeup and tell the police that the gun did not

belong to him. He told her that if they got other domestic charges dropped it would help him because he was facing a long prison term otherwise. The victim told the Defendant that she loved him but that this time she felt she had to tell the truth because the abuse kept getting worse.

When the victim met with Detective Jeffrey Rowe shortly thereafter, she asked the detective to take her to rehab. She met with a therapist, and she overcame her addiction. She credited this with her ability to no longer speak with the Defendant.

During cross-examination, the victim agreed that she was also taking Adderall, as prescribed, at the time she started dating the Defendant and throughout their relationship. She said that, when the Defendant was incarcerated after the New Year's Eve incident, she changed her name so that the two could continue communicating while he was incarcerated. She paid for the Defendant's bond and got him released from jail.

The victim agreed that she asked the court to dismiss the June 1, 2019 charges against the Defendant. She also requested dismissal of the order of protection that she had taken out against the Defendant based upon him holding a knife to her neck.

The victim said that the Defendant's charges for the November 2019 Friendsgiving incident were pending. He had also been charged with assaulting two officers, and there was body camera footage that was the basis of those charges. The victim agreed that she did not prosecute the charges stemming from the Defendant's assault of her in the hotel room in Columbia.

About the charges in this case, the victim said that the argument escalated quickly once she saw the gun. As the Defendant was straddling her and strangling her, he was telling her that this was how she was going to die, and this was what she wanted and what she deserved. It was at that moment that she heard knocking at her front door. The Defendant immediately jumped off her and grabbed the gun and threw it in the dryer. She ran to the door and told the officers that there was a gun.

Franklin Police Department Detective Jeffrey Rowe testified he interviewed the victim in this case, and contacted the 911 caller and the Williamson Medical Center to obtain the victim's medical records. The victim's medical records indicated that she told the treating physician that her boyfriend had assaulted her. She complained of bleeding from her ear and hearing impairment in that ear, as well as facial swelling and cuts to the inside of her lip. She also complained of bruising to her ribs and right flank. The physician's report indicated that the victim had a facial contusion, an abdominal wall contusion, and another contusion.

13

The detective interviewed the victim on May 11, and at that time he photographed her injuries. The detective identified and the State offered those pictures to the jury. The detective opined that the victim's injuries were consistent with her story.

The detective reviewed the victim's written statement that she gave officers on the night of the assault. In it, she said that the Defendant had said she was going to die. She also said that the gun came from someone named, "Juju" or "Te-to" and that they lived near a market. Based upon the victim's statement that she saw the Defendant hold the gun, he decided he did not need to send the gun to the Tennessee Bureau of Investigations for further testing.

During cross-examination, the detective agreed that the victim's story contained some inconsistencies.

Based upon this evidence, the jury convicted the Defendant of attempted first degree murder, aggravated assault by strangulation, aggravated assault by violating a restraining order, possessing a firearm during the commission of a dangerous felony, and unlawful possession of a weapon. The trial court sentenced him to a forty-five-year effective sentence. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court improperly admitted evidence of his prior acts of domestic violence against the victim; and (2) the evidence is insufficient to sustain his conviction for attempted first degree murder.

## A. Prior Bad Acts

The Defendant contends that the trial court erred when it admitted testimony about the following previous instances of domestic violence: the June 1, 2019 event; the February 2020 event in the hotel; and the New Year's Eve assault that occurred at the victim's house. He contends that the prejudicial effect of the testimony about these incidents outweighs any probative value. The State counters that the trial court did not abuse its discretion when it determined that the incidents were relevant to show the Defendant's motive and intent as well as to provide contextual background for the couple's relationship.

The admissibility of any evidence is governed in part by the general provisions as to relevance. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible and irrelevant evidence is not. Tenn. R. Evid. 402. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

14

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) governs the admissibility of evidence of a defendant's prior misconduct:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The terms of this rule establish that evidence of prior bad acts cannot be used to prove that a person has a propensity to commit a crime. *Id.*; *State v. Adkisson*, 899 S.W.2d 626, 645-46 (Tenn. Crim. App. 1994). Furthermore, in those instances where the prior conduct or acts are similar to the crimes on trial, the danger of unfair prejudice increases. *State v. James*, 81 S.W.3d 751, 762 (Tenn. 2002). Evidence of other crimes, wrongs, or acts may be admissible, however, when the prior conduct is relevant to an issue other than the accused's character, such as identity, motive, common scheme or plan, intent, or absence of mistake. *State v. Gilliland*, 22 S.W.3d 266, 271 & n.6 (Tenn. 2000); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). It may also be admissible to show contextual background. *State v. Little*, 402 S.W. 202, 210 (Tenn. 2013).

When addressing the Defendant's motion to exclude the four previous instances of domestic violence, one of which the Defendant does not contest on appeal,[2] the trial court followed the procedural requirements of Tennessee Rule of Evidence 404(b). During a hearing held outside the presence of the jury, the trial court found that these incidents were

---

[2]The November 2019 incident that the Defendant does not contest on appeal gave rise to the no-contact order bond condition that he was still subject to at the time of the assault that is the subject of this conviction.

established by clear and convincing evidence and were relevant to show the context of the relationship between the victim and the Defendant and to show the Defendant's motive and intent.

Because the trial court adhered to the procedural requirements of Rule 404(b), our review is limited to whether the admission of the evidence qualified as an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see also Gilliland*, 22 S.W.3d at 270 ("[W]hen the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, then any decision as to whether to admit evidence under Rule 404(b) will only be reversed for an abuse of discretion."). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012).

In *State v. Jarman*, 604 S.W.3d 24, 49 (Tenn. 2020), the Tennessee Supreme Court addressed the issue of the admissibility of prior acts of domestic violence in subsequent prosecutions. It recognized:

> Despite this general rule of exclusion, Tennessee courts have recognized a "line of cases" that stand for the proposition "that violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). *See also State v. Glebock*, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981) (citations omitted) (holding that evidence of the defendant's prior break-in at the victim's home and a prior threatening postcard were both relevant because the acts show the "relations existing between the victim and the defendant prior to the commission of the crime" and the acts "indicate[d] hostility toward the victim and a settled purpose to harm or injure her"); *State v. Turnbill*, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982) ("[T]he prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent.").

*Id.* at 49-50. The Court went on to hold that evidence of the defendant previously acting violently against the victim was relevant to establish the issue of motive and intent for his attempted murder of the victim. *Id.*

In our view, the trial court did not abuse its discretion by admitting the three previous instances of domestic violence. The defense theory was that the Defendant's state of mind mitigated intent and precluded the element of premeditation. The Defendant's

prior instances of domestic violence provide context for his actions and are highly probative of his intent to harm the victim. Any prejudice resulting from the reference to his prior offense pales in comparison. These instances of conduct also provide context for the victim's heightened fear when she saw the Defendant with a gun, which ultimately lead to this assault. She assumed that the only reason he would have a gun would be to kill her, as an escalation of his previous acts of domestic violence against her. Accordingly, she "freaked out" when she saw the weapon, a reaction that was contextually appropriate in light of the previous instances of domestic violence. It also provides context for the fact that the Defendant believed the victim when she said she was going to call the police when she saw the weapon because she had called the police on at least four previous occasions.

Finally, the evidence of his previous abuse also provided context for the victim being able to testify that this incident was different. She said that, while he had strangled her before, this time was different because he was more forceful, his demeanor, and the words he was saying. This testimony was important to rebut the Defendant's claim that he did not act with premeditation when he committed the offense. Accordingly, we conclude that the trial court did not err, and the Defendant is not entitled to relief on this issue.

## B. Sufficiency of Evidence

The Defendant contends that the evidence presented is insufficient to sustain his conviction for attempted first degree murder because there was insufficient evidence to prove premeditation. He asserts that this incident occurred as the result of a heated argument and that his actions were driven by immediate passion and immense emotions. The State counters that the Defendant's premeditation was shown by his strong motive for wanting to kill the victim before she contacted police, the seriousness of the charges he was facing and the resulting prison time he could face, his statements asking her if this was how she wanted to die, his attempt to cover up the offense, the timeline of the offense, and the force he used when strangling the victim. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and

inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be[.]" T.C.A. § 39-12-101(a)(1). First degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1) (Supp. 2019). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d) (Supp. 2019). This section further defines premeditation:

18

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *Bland*, 958 S.W.2d at 660); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

We conclude that the evidence, viewed in the light most favorable to the State, supports the jury's conclusion that the Defendant acted with premeditation when he strangled the victim. The Defendant, who had a history of violence toward the victim, was a convicted felon who was not allowed to be in possession of a handgun. When the victim saw him with a handgun and told him that she was going to call the police, which she had done on multiple occasions in the past. He responded angrily and told her that, if she did, it would end his life and that his son would grow up without a father. The Defendant attacked the victim and asked her if this was "how you want to die."

The victim, who had been strangled by the Defendant before, said that this time was more powerful; that he appeared angry, and that his statements about her death seemed serious; and he only stopped applying forceful pressure to her neck when the police arrived. After the incident, the Defendant attempted to conceal the event, asking the victim to recant her story.

This evidence provides a sufficient basis for the jury's conclusion that the Defendant acted with premeditation. His contention that this was a mutual fight and that the victim was engaged in a physical altercation with him, so his intent was mitigated was rejected by

the jury.  This finding is within the providence of the jury, and we will not disturb it on appeal.  The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE